UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LIZETH O.,[1]

              Plaintiff,

       v.

ANDREW SAUL, Commissioner of Social
Security Administration,

          Defendant.

Case No. 2:19-cv-09733-JC

MEMORANDUM OPINION

## I.   SUMMARY

On November 13, 2019, plaintiff, who is proceeding *pro se*, filed a Complaint seeking review of the Commissioner of Social Security's denial of plaintiff's application for benefits. The parties have consented to proceed before the undersigned United States Magistrate Judge.

This matter is before the Court on the parties' cross motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion")  (collectively "Motions"). The Court has taken the Motions under submission without oral argument. See Fed. R. Civ. P. 78; L.R. 7-15; November 18, 2019 Case Management  Order ¶ 5.

///

-----

[1] Plaintiff's name is partially redacted to protect plaintiff's privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

Based on the record as a whole and the applicable law, the decision of the Commissioner is AFFIRMED. The findings of the Administrative Law Judge ("ALJ") are supported by substantial evidence and are free from material error.

## II.    BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

Based on plaintiff's applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") filed on September 7, 2012, plaintiff was found to be disabled beginning on April 6, 2012, due to severe major depressive disorder (severe, recurrent), panic disorder, and cognitive disorder with problems in processing speed and short term memory, and epilepsy, which met or equaled Listing 12.04 (Affective disorders) (see 20 C.F.R. Pt. 404, Subpt. P, App. 1 (eff. through January 16, 2017); 20 C.F.R. § 404.1520(d)). (Administrative Record ("AR") 252-56, 291-316, 415-25, 441). The most recent favorable medical decision which found plaintiff to be disabled (i.e., "comparison point decision" or "CPD") was dated July 9, 2014, and relied heavily on a January 2014 psychological consultative examination. (AR 252-56).[2]

On January 31, 2017, it was determined that plaintiff no longer was disabled and that plaintiff's benefits would terminate as of January 15, 2017. (AR 257-71, 287-90, 317-24). A Disability Hearing Officer held a hearing and upheld the determination that plaintiff no longer was disabled. (AR 333-56). On August 2, 2017, plaintiff requested a hearing before an Administrative Law Judge. (AR 357).

---

[2]Consultative examiner Dr. Betty Borden, Ph.D., prepared a psychological evaluation dated January 22, 2014. (AR 825-31). Dr. Borden diagnosed major depressive disorder (severe, recurrent), panic disorder, and cognitive disorder with problems in processing speed and short term memory, and assessed marked impairment in social functioning and marked restrictions in concentration, persistence and pace. (AR 830; see also AR 834-37 (Medical Source Statement of Ability to Do Work-Related Activities (Mental) form by Dr. Borden dated January 22, 2014, indicating mild limitations in plaintiff's ability to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions, and to interact appropriately with supervisors and co-workers, and marked limitations in plaintiff's ability to understand, remember and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public and respond appropriately to usual work situations and to changes in the routine work setting)). Dr. Borden opined that plaintiff would be able to perform activities of daily living but would have difficulty working in a competitive work setting due to emotional problems. (AR 830). Dr. Borden hoped that with appropriate treatment, plaintiff would be able to return to competitive employment. (AR 830).

2

On February 15, 2018, a new ALJ examined the medical record and heard testimony from plaintiff and a vocational expert.  (AR 178-205).  The ALJ determined that additional consultative psychological and neurological evaluation and testing were necessary to evaluate plaintiff's alleged mental and physical conditions, so the ALJ ordered testing and continued the hearing.  (AR 198-99).  A subsequent hearing was held on August 16, 2018, after the consultative examinations, where the ALJ heard testimony from plaintiff, plaintiff's boyfriend, and a vocational expert (AR 206-48).

By decision dated September 5, 2018, the ALJ determined that plaintiff's disability ended on January 15, 2017, and plaintiff had not become disabled again through the date of the decision. (AR 30-42).  Specifically, the ALJ found:  (1) since January 15, 2017, plaintiff suffered from the following severe impairments:  a seizure disorder and possible borderline to low average intellectual functioning (AR 33, 35); (2) plaintiff's impairments, considered individually or in combination, did not meet or medically equal a listed impairment (AR 33-34); (3) medical improvement occurred on January 15, 2017, based in part on a December 2016 consultative psychiatric examination, and a March, 2018 consultative psychological examination, such that plaintiff's impairments no longer met Listing 12.04 (AR 34-35); (4) since January 15, 2017, plaintiff retained the residual functional capacity to perform work at all exertional levels limited to:  seizure precautions, non-complex routine tasks, and no fast-paced work such as rapid assembly or conveyor belt work (AR 35-40 (relying in part on State Agency physician opinions at AR 267-69)); (5) since January 15, 2017, plaintiff could not perform any past relevant work (AR 40-41); (6) since January 15, 2017, there are jobs that exist in significant numbers in the national economy that plaintiff could perform, specifically laundry laborer, janitor, and hand packager (AR 41-42 (adopting vocational expert testimony at AR 240-41)); and (7) since January 15, 2017, plaintiff has not become disabled again (AR 42).

On May 16, 2019, the Appeals Council considered additional evidence but denied plaintiff's application for review.  (AR 11-13; see also AR 24-26, 50-132 (plaintiff-supplied evidence)).

///

///

///

3

III.   **APPLICABLE LEGAL STANDARDS**

A.     **Sequential Evaluation Process – Termination of Benefits**

To qualify for disability benefits, a claimant must show that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by regulation on other grounds as stated in Sisk v. Saul, 820 Fed. App'x 604, 606 (9th Cir. 2020).

Once a claimant is found disabled under the Social Security Act, a presumption of continuing disability arises. See Bellamy v. Secretary of Health & Human Services, 755 F.2d 1380, 1381 (9th Cir. 1985) (citation omitted). The Secretary may not terminate benefits unless substantial evidence demonstrates sufficient medical improvement in a claimant's impairment that the claimant becomes able to engage in substantial gainful activity. See 42 U.S.C. § 1382c(a)(4)(A); 42 U.S.C. § 423(f); 20 C.F.R. §§ 404.1594, 416.994; Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983).

In assessing whether a claimant continues to be disabled, an ALJ must follow an eight-step sequential evaluation process for DIB claims and a seven-step process for SSI claims:[3]

(1)    Is the claimant presently engaged in substantial gainful activity? If so, and any applicable trial work period has been completed, the claimant's disability ends. If not, proceed to step two.

(2)    Does the claimant have an impairment, or combination of impairments, which meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant's disability continues. If not, proceed to step three.

///

///

---

[3]Since the sequential evaluation process for DIB and SSI claims are materially the same except as to the first step (which governs DIB claims only), the Court describes only the DIB process.

4

(3)   Has there been medical improvement as shown by a decrease in the medical severity of the impairment(s) present at the time of the CPD?[4]  If so, proceed to step four.  If not, proceed to step five.

(4)   Was any medical improvement related to the ability to work (*i.e.*, has there been an increase in the claimant's residual functional capacity)?  If so, proceed to step six.  If not, proceed to step five.

(5)   Is there an exception to medical improvement?  If not, the claimant's disability continues.  If an exception from the first group of exceptions to medical improvement applies (*i.e.*, substantial evidence shows that the claimant has benefitted from "advances in medical or vocational therapy or technology" or "undergone vocational therapy" if either is "related to [the] ability to work"), see 20 C.F.R. §§ 404.1594(d) & 416.994(b)(3), proceed to step six.  If an exception from the second group[5] applies (*i.e.*, disability determination was fraudulently obtained, claimant was uncooperative, unable to be found, or failed to follow prescribed treatment), see 20 C.F.R. §§ 404.1594(e) & 416.994(b)(4), the claimant's disability ends.

(6)   Is the claimant's current combination of impairments severe?  If so, proceed to step seven.  If not, the claimant's disability ends.

(7)   Does the claimant possess the residual functional capacity to perform claimant's past relevant work?  If so, the claimant's disability ends.  If not, proceed to step eight.

(8)   Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow the claimant to do other

---

[4]"Medical improvement" is defined as "any decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled" (*i.e.*, the CPD).  20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).  "A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs and/or laboratory findings associated with [a claimant's] impairment(s)."  Id.

[5]The second group of exceptions may be considered at any point in the sequential evaluation process.  20 C.F.R. §§ 404.1594(b)(5), 416.994(b)(5)(iv).

work?  If so, the claimant's disability ends.  If not, the claimant's disability

continues.

20 C.F.R. §§ 404.1594(f), 416.994(b)(5).

Although the claimant retains the burden to prove disability, the Commissioner has the burden to produce evidence to meet or rebut the presumption of continuing disability.  Bellamy, 755 F.2d at 1381 (citation omitted).

### B.      Federal Court Review of Social Security Disability Decisions

A federal court may set aside a denial of benefits only when the Commissioner's "final decision" was "based on legal error or not supported by substantial evidence in the record." 42 U.S.C. § 405(g); Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  The standard of review in disability cases is "highly deferential."  Rounds v. Commissioner of Social Security Administration, 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks omitted).  Thus, an ALJ's decision must be upheld if the evidence could reasonably support either affirming or reversing the decision.  Trevizo, 871 F.3d at 674-75 (citations omitted).  Even when an ALJ's decision contains error, it must be affirmed if the error was harmless.  See Treichler v. Commissioner of Social Security Administration, 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to the ultimate nondisability determination; or (2) ALJ's path may reasonably be discerned despite the error) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Trevizo, 871 F.3d at 674 (defining "substantial evidence" as "more than a mere scintilla, but less than a preponderance") (citation and quotation marks omitted). When determining whether substantial evidence supports an ALJ's finding, a court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion[.]"  Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

Federal courts review only the reasoning the ALJ provided, and may not affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely."  Trevizo, 871 F.3d at 675 (citations omitted).  Hence, while an ALJ's decision need not be drafted with "ideal clarity," it must, at a

1  minimum, set forth the ALJ's reasoning "in a way that allows for meaningful review." Brown-

2  Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

3      A reviewing court may not conclude that an error was harmless based on independent

4  findings gleaned from the administrative record. Brown-Hunter, 806 F.3d at 492 (citations

5  omitted). When a reviewing court cannot confidently conclude that an error was harmless, a

6  remand for additional investigation or explanation is generally appropriate. See Marsh v. Colvin,

7  792 F.3d 1170, 1173 (9th Cir. 2015) (citations omitted).

8      Where, as here, a claimant submits new evidence to the Appeals Council for review, the

9  Court must consider such evidence in determining whether the ALJ's decision was supported by

10  substantial evidence and free from legal error. See Brewes v. Commissioner of Social Security

   Administration, 682 F.3d 1157, 1162-63 (9th Cir. 2012); 20 C.F.R. §§ 404.970(a)(5), (c),

11  416.1470(b). Accordingly, the Court has considered the evidence submitted for the first time to the

12  Appeals Council in reaching the decision herein.

13  **IV.    DISCUSSION**

14      Plaintiff alleges that the ALJ did not properly consider the combination of her depression,

15  anxiety, and seizure disorder in determining whether plaintiff's condition had improved to the point

16  of non-disability as of January 15, 2017, and alleges that her condition actually became worse

17  requiring more treatment and medications. See Plaintiff's Motion at 1-2. Plaintiff further alleges

18  that the ALJ did not properly consider the reports of her treating neurologist Dr. George Nune and

19  other doctors opining that plaintiff was disabled. Id. at 2. Finally, plaintiff contends, contrary to

20  the ALJ's assertion that she is non-compliant with seizure medications that control her seizures,

21  that she is taking her medication as prescribed and still getting multiple seizures. Id. at 2.

22      Defendant asserts that the ALJ properly considered plaintiff's alleged impairments and the

23  evidence, and that substantial evidence supports the ALJ's adverse decision. See Defendant's

24  Motion.

25      For the reasons discussed below, the Court concludes that the ALJ properly considered

26  plaintiff's impairments and that substantial evidence supports the ALJ's adverse decision.

27  ///

28  ///

### A.     Summary of the Relevant Medical Record

Much of the medical record concerns the period when plaintiff was deemed disabled from her depression (*i.e.*, from April 6, 2012 to January 15, 2017).  Because the ALJ's consideration of Dr. Nune's opinion is at issue, the following summary is of treatment records beginning with Dr. Nune's treatment in February 2015.

Dr. Nune of the USC Comprehensive Epilepsy Center treated plaintiff regularly from February 2015 through at least July 2016.  (AR 82-132, 874-1010).  Plaintiff presented to Dr. Nune in February 2015 with "medically refractory bitemporal epilepsy of unclear etiology" since age 17.  (AR 125, 874).  Plaintiff reported having two types of seizures:  one which she had about five times a month where she loses consciousness for less than a minute and returns to normal in about five minutes, and convulsive-type seizures dating back to 2013, triggered by stress, anger, and missing medications, which she had not had in the last few months on her medication dosages.  (AR 125, 874).  She was reluctant to increase her new anti-epilepsy medication as ordered due to dizziness and worsening depression, anxiety, and hair loss on her prior medications.  (AR 125, 874).

Past testing included:  (1) June 2013 and January 2014 brain MRIs that were normal; (2) January, 2014 video EEG monitoring showing four clinical seizures; and (3) a June 2014 ambulatory EEG showing right temporal epileptiform discharges and intermittent sharply contoured slowing.  (AR 125, 874).  Plaintiff also reportedly had a history of depression and anxiety with a history of suicide attempts.  (AR 125, 874).

Dr. Nune noted that plaintiff may be suffering from autoimmune epilepsy and wanted a trial of IVIG or a stimulation device since plaintiff reportedly experienced side effects at relatively low medication doses, but further evaluation was necessary.  (AR 126-27, 876).  Dr. Nune referred plaintiff for psychiatric treatment for her depression and anxiety.  (AR 127, 876).  Plaintiff was to continue two anti-epileptic medications.  (AR 127, 886, 888-89).

At her March 2015 visit, plaintiff reported having only two seizures since her last clinic visit in February 2015, one of which occurred after she missed a medication dose.  (AR 122, 891).  Dr. Nune ordered an IVIG trial, lumbar puncture, and video EEG monitoring, instructed

///

8

plaintiff to keep a seizure diary, continued plaintiff's medications, and again referred plaintiff to psychiatry. (AR 123, 893, 897, 900).

Plaintiff was admitted to the hospital in May 2015 for video EEG monitoring and to try IVIG treatment and test for autoimmune epilepsy. (AR 105 915). She reported having a cluster of seizures in the last month that she thought were triggered by a dog allergy, and one other seizure when she missed her medications. (AR 105, 915). She exhibited "abundant bitemporal epileptiform discharges and slowing" and had seizures of which she was unaware. (AR 107, 917; see AR 918-31 (video EEG reports)). A brain MRI was unremarkable but for subtle smaller volume of the left hippocampal body. (AR 933-34). Dr. Nune planned to try IVIG treatment over the next two months, but noted that monitoring plaintiff's response would be difficult because she is not aware of the seizures she was having. (AR 107, 918).

At her May 2015 follow up visit, plaintiff reported having two seizures since she had been discharged from video EEG monitoring earlier that month, and that it appeared that the seizures occurred when it was about time to take her medication. (AR 102, 902). Her medications were increased. (AR 103, 904).

In July 2015, plaintiff reported that her seizures had improved with five recorded seizures since her last visit that were shorter and more often at night. (AR 98, 942). She reported having no medication side effects. (AR 98, 942). Additional testing was unremarkable. (AR 98, 942). Her medications were continued and a repeat IVIG infusion was planned for August. (AR 99, 944).

In September 2015, plaintiff reported having three seizures in June, three in July, two in August, and five in September, suggesting her seizures were worsening due to stress despite taking her medications regularly. (AR 95, 954). Plaintiff's insurance had denied a second IVIG infusion. (AR 95, 954). Her depression and anxiety reportedly were improved. (AR 96, 955). She was prescribed an additional anti-seizure medication. (AR 97, 956).

In November 2015, plaintiff reported having four to six seizures in the last month. (AR 92, 965). Her new anti-seizure medication was increased. (AR 93, 967). In January 2016, she reported having one seizure since her visit in November 2015, due to missing her medications

///

9

the night before, and that she had tried cannabis oil. (AR 89, 976). Her medications were continued. (AR 90, 978).

In April of 2016, plaintiff reported having two to three seizures since January, which was a "significant improvement compared to previously." (AR 82, 989). She reported that a month earlier she had a seizure while working out and was taken to the emergency room, where it took up to 10 minutes for her to be able to respond to questions normally. (AR 82, 989). Plaintiff thought she had the seizure from not eating regularly and working out too hard after having not done so in a long time; she reportedly was tolerating her medications well and her mood was generally good but for some stress at home. (AR 82, 989). Dr. Nune increased one of the anti-seizure medications. (AR 991).

In July 2016, plaintiff reported that she had one seizure in the last month and that she had not increased her anti-seizure medication as instructed at the last visit because she was not aware that she was supposed to do so. (AR 84, 1000). She again was instructed to increase the dose of that medication and to return in one month. (AR 85, 1002). Dr. Nune noted that plaintiff was wanting to become pregnant which could be affected by her medications, and noted the need to formulate a plan before she becomes pregnant. (AR 85, 1002).

The next record from Dr. Nune is a note dated June 14, 2018 – almost two years later, and after plaintiff was found to have improved to the point of no longer being disabled – which states, "Ms. [O.] is disabled due to drug-resistant temporal lobe epilepsy." (AR 51, 1205). There is no treatment record accompanying this note.

Plaintiff called Dr. Nune in July 2018, reporting that she had not followed up due to insurance issues and that her seizures were happening about once a month, but for a few weeks earlier when she experienced a cluster of seizures associated with a gastrointestinal issue for which she had gone to the emergency department for treatment. (AR 1206). Plaintiff had stopped one of her anti-seizure medications that she did not remember ever taking, and reportedly had "fairly good" compliance with occasionally forgetting her morning doses for her other medications. (AR 1206). Dr. Nune ordered extended release medication to improve compliance, and considered adding the anti-seizure medication plaintiff was not taking. (AR 1206). There are no other treatment notes from Dr. Nune in the record.

There are a few treatment records for the period of July 2016 through June of 2018, when plaintiff was not treating with Dr. Nune.  A progress note from neurologist Dr. Pablo Arevalo in February 2017, reports that plaintiff was last seen in 2009, and for the last two months had more frequent seizures with reports that she occasionally may forget her morning medications.  (AR 1019; see also AR 1068-69 (Dr. Arevalo's 2009 evaluation)).  A March 2017 note reports that plaintiff had one seizure since her last visit.  (AR 1018).  Her seizures reportedly were controlled.  (AR 1018).   Blood testing at the time suggested that her seizure medications were within the therapeutic range.  (AR 1020).

It appears that the rest of plaintiff's seizure treatments were provided by hospital stays or emergency room visits.  Plaintiff was treated for a seizure with a head injury in October 2016 (when she was still disabled) (AR 70-79, 1028-37), seizures in May 2017 due to missing her medications, with reported poor compliance with her medical regimen after plaintiff admitted missing three days of medication doses and no recent treatment by a neurologist (AR 1093-1118, 1125-26, 1131-35), a seizure in July 2017, with her last reported seizure two months earlier and no reported missed medication doses (AR 1168-73), a seizure in June 2018 due to non-compliance with her seizure medications and stomach flu (AR 1210-17), and a seizure in November 2018 (AR 53-69).

During her May 2017 hospital stay, plaintiff was evaluated by a psychiatrist for depression, poor motivation and being fearful.  (AR 1102).  She reported no psychiatric hospitalizations or medications but a vague history of visual hallucinations.  (AR 1102).  She reportedly was seeing a therapist and would be given a referral for a treatment program on discharge.  (AR 1102).  Mental status examination reported anxious and depressed affect, and vague reported audio hallucinations with no other reported abnormal findings.  (AR 1102-03).  She was diagnosed with depressive disorder (not otherwise specified), generalized anxiety disorder, and seizure disorder, and recommended for outside psychiatric treatment.  (AR 1103).

Plaintiff had presented to the Los Angeles County Department of Mental Health on April 1, 2013, for treatment for her depression and anxiety and was diagnosed with major depressive disorder (recurrent, moderate) and assigned a current Global Assessment of Functioning Score

///

///

("GAF") of 55.[6]  (AR 810-14).  She was prescribed Celexa and followed monthly for medication management in April and May, reporting that she was feeling better.  (AR 816-21).  The next treatment notes are for August 2017.  (AR 1176-91).  She had been referred back by her primary care physician for daily sadness, depression, isolation, anxiety, crying spells, stress, insomnia, memory problems, poor appetite, delusional thoughts, and paranoid ideations.  (AR 1176, 1190).  She recently had issues with the police resulting in her boyfriend's arrest.  (AR 1177).  She was diagnosed with severe major depression with psychotic features prescribed medication.  (AR 1191).  There are no additional mental health treatment records.

Meanwhile, in December of 2016, plaintiff had undergone a Complete Psychiatric Evaluation by consultative examiner Dr. Ernest A. Bagner, III.  (AR 1013-16).  Dr. Bagner reviewed no medical records.  (AR 1013).  Plaintiff complained of anxiety and depression for eight years with crying spells, low energy and motivation, helplessness, hopelessness, sadness, frustration, trouble concentrating, and memory trouble.  (AR 1013).  Plaintiff reported that she attended to family and doctor's appointments daily, could dress and bathe independently, do household chores and watch television.  (AR 1014).  Mental status examination was normal but for a tense appearance, soft slow speech, anxious mood, psychomotor retardation, and inability to spell "Music" forward or backward.  (AR 1015).  Dr. Bagner diagnosed major depressive disorder with anxiety in remission and assigned a current GAF Score of 70.[7]  (AR 1016).  Dr. Bagner opined that plaintiff would have no limitations.  (AR 1016).

///

---

[6]A GAF score reflects "the clinician's judgment of the individual's overall level of functioning" regarding only psychological, social and occupational functioning but not considering physical or environmental limitations.  See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. (Text Revision) 2000) ("DSM-IV TR"); Lawless v. Evans, 545 F. Supp. 2d 1044, 1050 n.7 (C.D. Cal. 2008).  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV TR at 34.

[7]A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV TR at 34.

State Agency physicians reviewed in January 2017, and opined that plaintiff could work at all exertion levels with seizure precautions, and would be capable of understanding, remembering, and carrying out simple instructions, and maintaining concentration and attention for simple tasks. (AR 267-69).

The ALJ thereafter ordered additional consultative psychological and neurological evaluation and testing to evaluate plaintiff's alleged mental and physical conditions. (AR 198-99). Psychologist consultative examiner Dr. Sara M. Hough, Psy. D., prepared a Mental Status Exam dated March 17, 2018. (AR 1192-99). Dr. Hough did not review any medical records. (AR 1192). Plaintiff complained of depression, anxiety, and short term memory issues. (AR 1193). Plaintiff reported one psychiatric hospitalization in 2016 purportedly for paranoia and audio hallucinations, she noted that her anti-seizure medications were likely the cause and that she had not experienced any hallucinations, delusions or psychotic symptoms since her anti-seizure medications were changed.[8] (AR 1193). She was not receiving any current treatment for her depression or anxiety. (AR 1193). She reported extreme stress due to relationship challenges with her then ex-boyfriend who was incarcerated. (AR 1193). She reported that she stopped working in 2013 due to her seizures and had no problems getting along with coworkers or her supervisors. (AR 1194). She reportedly was able to do household chores and was living with her parents. (AR 1194).

Mental status examination was normal but for mildly slow movement, mildly subdued mood with congruent affect and plaintiff reporting that her current symptoms of depression and anxiety stemmed from relationship challenges, mildly impaired to borderline cognitive functioning, mildly impaired to borderline memory, mildly impaired concentration and calculation with the greatest deficit in mental flexibility, and fair insight. (AR 1195-96). Intelligence testing yielded a full scale IQ of 65, memory testing showed mild impairment, trails testing was in the moderate to severely impaired range, and nonverbal intelligence testing was below average. (AR 1196-98).

Dr. Hough diagnosed seizure disorder and opined that plaintiff would have: (1) no impairment in understanding, remembering, and carrying out simple one or two-step job

---

[8]The record does not contain any treatment notes for a 2016 psychiatric hospitalization.

instructions, relating to coworkers or interacting with the public, accepting instructions from supervisors, working without special or additional supervision, or maintaining regular attendance or performing work activities consistently if the activities are simple and routine; (2) mild impairment in doing detailed and complex tasks, associating with day-to-day activity including attendance and safety, maintaining regular attendance and performing activities on a consistent basis if the work environment has continuous change; and (3) moderate impairment in maintaining concentration, attention, persistence and pace. (AR 1198). Dr. Hough noted that plaintiff's reports of depression and anxiety did not meet the clinical threshold for a diagnosis. (AR 1198).

Consultative examiner Dr. James T. Lin examined plaintiff on April 2, 2018, and prepared a neurological evaluation. (AR 1201-03). Dr. Lin did not review any medical records or order any testing. (AR 1202-03). Plaintiff complained of a seizure disorder, depression, and anxiety for the past 10 years. (AR 1201). She reported that her seizures happened mostly when she was under stress or anxious/depressed, and could not quantify how well her seizures were controlled. (AR 1201). Physical and neurological examination findings were unremarkable. (AR 1202-03). Dr. Lin diagnosed a history of seizure disorder and opined that plaintiff would have no strength or mobility limits, but also opined that plaintiff could carry 10 pounds intermittently, walk in a normal pace for one block at a time, sit for at least four hours a day intermittently, and would have no problem with dexterity or fine fingering. (AR 1203).

**B.      The ALJ Properly Considered the Combined Effects of Plaintiff's Impairments and the Record Evidence in Determining That Plaintiff's Condition Improved as of January 15, 2017; Substantial Evidence Supports the ALJ's Determination That Plaintiff No Longer Was Disabled.**

Plaintiff contends that the ALJ did not consider properly the combination of her depression, anxiety, and seizure disorder in determining that plaintiff's condition had improved as of January 15, 2017, to the point that she no longer was disabled. See Plaintiff's Motion, at 1-2. The record belies this contention.

In contrast to Dr. Borden's January 2014 consultative examiner opinion on which the CPD was based, which found that plaintiff had major depressive disorder (severe, recurrent), panic disorder, and cognitive disorder which would result in marked impairments (AR 254-55, 830), the

recent consultative examiners determined that plaintiff's major depressive disorder with anxiety was either in remission (AR 1016), or did not meet the clinical threshold for diagnosis (AR 1198), and would not result in any impairments.  (AR 1016, 1198).

For plaintiff's seizure disorder, the consultative examiners determined that plaintiff would have at most moderate impairment in maintaining concentration, attention, persistence and pace, and no strength or mobility limits with noted ability to carry 10 pounds intermittently, sit for at least four hours a day, and walk for one block at a time.  (AR 1198, 1203).  The State Agency physicians opined that plaintiff would require only seizure precautions, and was capable of understanding, remembering, and carrying out simple instructions and could maintain concentration and attention for simple tasks.  (AR 267-69).

The ALJ considered the medical opinion evidence and found that plaintiff's condition had improved as of January 15, 2017, such that she no longer met the criteria for Listing 12.04 based on her depression and anxiety.  (AR 34-35).  In finding that since January 15, 2017, plaintiff retained a residual functional capacity to work at all exertional levels limited to seizure precautions, non-complex routine tasks, and no fast-paced work such as rapid assembly work or conveyor belt work, the ALJ gave:  (1) "great weight" to the State Agency physician opinion finding plaintiff capable of simple work at all exertion levels limited to seizure precautions; and (2) great or "significant weight" to Dr. Hough's opinion, as corroborated by Dr. Bagner, that plaintiff would have no impairment in doing simple and routine tasks and moderate impairment in maintaining concentration, attention, persistence, and pace.  (AR 35, 38-40).[9]

The ALJ was entitled to rely on the consultative examiner opinions, which were based on the examiners' independent examination of plaintiff, without more, as substantial evidence supporting the ALJ's determination that plaintiff's medical condition had so improved.  See, e.g., Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultative examiner's opinion based on independent examination of claimant constituted substantial evidence supporting ALJ's findings)

---

[9]The ALJ gave little weight to Dr. Lin's consultative examiner opinion which purportedly assessed no strength or mobility limits to the extent it assigned any physical restrictions (*i.e.*, lifting 10 pounds intermittently, sitting at least four hours intermittently, and walking one block at a time) (AR 1203), as completely unsupported by Dr. Lin's unremarkable examination findings.  (AR 38).

(citations omitted).  The ALJ also was entitled to rely on the consistent State Agency physicians' opinions.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (opinion of non-examining physician "may constitute substantial evidence when it is consistent with other independent evidence in the record"); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (where the opinions of non-examining physicians do not contradict "all other evidence in the record" an ALJ properly may rely on these opinions) (citation and emphasis omitted).

Contrary to plaintiff's assertions, the record does not support a finding for the period at issue that her condition became worse or required more treatment and medications.  As summarized above, plaintiff did not seek out regular treatment throughout the period at issue.  Between June of 2016 and September of 2018 (when the ALJ issued the adverse decision), plaintiff had one psychiatric evaluation in May 2017 in association with a hospital stay for seizures which resulted in no treatment (AR 1102-03), and she went for one mental health referral in August 2017, for which she was prescribed medication (AR 1176-91), but she did not follow up with any regular mental health treatment.  By the time of her March 2018 psychological consultative examination, plaintiff reported receiving no mental health treatment.  (AR 1193).  If plaintiff required more treatment for her depression and anxiety after the alleged improvement date and prior to the ALJ's adverse decision, it is not reflected in the existing record.[10]

Regarding plaintiff's seizures, the record does show that throughout plaintiff's regular treatment with Dr. Nune and subsequently with Dr. Arevalo, plaintiff's medications were increased/modified to address plaintiff's seizures, but her seizures reportedly improved over time and mostly occurred when she missed medication doses.  (AR 874, 886, 889-89, 891, 902, 904, 942, 954, 956, 967, 976, 989, 1000, 1002, 1018-19, 1206).  By March 2017 – her last apparent regular treatment visit – plaintiff's seizures reportedly were well controlled, with blood testing

---

[10]Plaintiff submitted with her motion for summary judgment evidence related to a July 2019 72-hour psychiatric hold.  See Plaintiff's Motion at 3-15.  Plaintiff's boyfriend submitted this same evidence to the Appeals Council, reporting that plaintiff had been hospitalized and gone to the emergency room for mental health issues including delusions and head injuries from falls related to seizures.  (AR 6-10).  The Court has considered this evidence in determining that a remand is not warranted.  The decision at issue concerns disability through September 5, 2018.  If plaintiff wishes to be considered disabled for a period after September 5, 2018, she should file a new application for benefits.

showing the presence of medications within therapeutic ranges. (AR 1018, 1020). Subsequent hospital and emergency room treatment records reflect that seizures in May 2017 and June 2018 were due to missing medication doses. (AR 1093-1118, 1210-17). When plaintiff returned to Dr. Nune for one appointment in July 2018, she reported that she was not taking one of her prescribed seizure medications and occasionally missed doses of the others, so Dr. Nune ordered extended release medication to improve compliance. (AR 1206).

Finally, plaintiff alleges that the ALJ did not properly consider Dr. Nune's June 2018 opinion, provided after a two-year gap in treatment, that plaintiff's seizure disorder is disabling.[11] See Plaintiff's Motion at 2. The ALJ acknowledged Dr. Nune's note concluding that plaintiff was disabled due to drug-resistant temporal lobe epilepsy, but assigned it little weight as: (1) conclusory and unsupported by objective medical evidence; (2) addressing a legal conclusion of disability reserved for the Commissioner; and (3) as inconsistent with the medical record since January 15, 2017, which (a) failed to reflect detailed medical findings and other objective medical documentation of the frequency or severity of seizure activity warranting a finding of disability, and (b) is devoid of any significant treatment by Dr. Nune since January 15, 2017. (AR 38). The ALJ did not materially err in considering Dr. Nune's opinion.

In Social Security cases, the amount of weight given to medical opinions generally varies depending on the type of medical professional who provided the opinions, namely "treating physicians," "examining physicians," and "nonexamining physicians" (e.g., "State agency medical or psychological consultant[s]"). 20 C.F.R. §§ 404.1527(c)(1)-(2) & (e), 404.1502, 404.1513(a); 416.927(c)(1)-(2) & (e), 416.902, 416.913(a); Garrison, 759 F.3d at 1012 (citation and quotation marks omitted).[12] A treating physician's opinion is generally given the most weight, and may be

---

[11]Plaintiff also generally cites to other doctor opinions that she is disabled. See Plaintiff's Motion at 2. Only one other treatment provider offered any opinion about plaintiff's disability which significantly predates plaintiff's change of condition in January 2017. Treating neurologist Dr. Danielle Yanuck opined in September 2013 that plaintiff's seizures were "poorly controlled" and would render plaintiff unable to work for the next six months – a time when plaintiff was found disabled. See AR 754, 784-86 (Dr. Yanuck's opinion).

[12]The Agency has replaced the rules in § 404.1527 with respect to claims filed on or after March 27, 2017. See 20 C.F.R. § 404.1520c. For claims filed before that date, such as the claims

(continued...)

1  "controlling" if it is "well-supported by medically acceptable clinical and laboratory diagnostic

2  techniques and is not inconsistent with the other substantial evidence in [the claimant's] case

3  record[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Revels v. Berryhill, 874 F.3d 648, 654 (9th

4  Cir. 2017) (citation omitted). In turn, an examining, but non-treating physician's opinion is entitled

5  to less weight than a treating physician's, but more weight than a nonexamining physician's

6  opinion. Garrison, 759 F.3d at 1012 (citation omitted).

7         A treating physician's opinion, however, is not necessarily conclusive as to either a physical

8  condition or the ultimate issue of disability. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.

9  1989) (citation omitted).  An ALJ may reject the uncontroverted opinion of a treating physician by

10 providing "clear and convincing reasons that are supported by substantial evidence" for doing so.

11 Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted). Where a treating

12 physician's opinion is contradicted by another doctor's opinion, an ALJ may reject such opinion

13 only "by providing specific and legitimate reasons that are supported by substantial evidence."

14 Garrison, 759 F.3d at 1012 (citation and footnote omitted).  Here, the ALJ's reasons for rejecting

15 Dr. Nune's opinion satisfy either standard.

16        The ALJ properly discounted Dr. Nune's opinion that plaintiff is disabled – rendered

17 without explanation and two years after Dr. Nune's most recent treatment of plaintiff – as

18 conclusory and inadequately supported by clinical findings.  See Bray v. Commissioner of Social

19 Security Administration, 554 F.3d 1219, 1228 (9th Cir. 2009) ("An ALJ may reject the opinion of

20 any physician, including a treating physician, to the extent the opinion is 'brief, conclusory and

21 inadequately supported by clinical findings.'") (citation omitted); Connett v. Barnhart, 340 F.3d

22 871, 875 (9th Cir. 2003) (ALJ properly rejected treating physician's opinion where "treatment

23 notes provide[d] no basis for the functional restrictions [physician] opined should be imposed on

24 [claimant]").

25        The ALJ also properly cited Dr. Nune's opinion that plaintiff is disabled as concerning an

26 issue reserved for the Commissioner.  See Boardman v. Astrue, 286 Fed. Appx. 397, 399 (9th Cir.

27        [12](...continued)

28 filed in the instant case, the treating-source rule set forth in § 404.1527 is still applied on review.
   See, e.g., Nathan K. v. Saul, 2019 WL 4736974, at *3 n.6 (C.D. Cal. Sept. 27, 2019).

2008) ("[The] determination of a claimant's ultimate disability is reserved to the Commissioner. . . a physician's opinion on the matter is not entitled to special significance."); <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1004 (9th Cir. 2005) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.") (citation omitted); 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled.  A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); <u>compare</u> Social Security Ruling 96-5p ("adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner"); <u>Hill v. Astrue</u>, 698 F.3d 1153, 1160 (9th Cir. 2012) (doctor properly could assess claimant's "likelihood of being able to sustain full time employment" based on objective medical evidence).  Here, Dr. Nune provided no explanation for his opinion that plaintiff is disabled, cited no objective medical evidence, and provided no basis from which to judge whether Dr. Nune's opinion that plaintiff is disabled falls within the definition of disability in the Social Security context.  Without more, it was within reason for the ALJ to reject Dr. Nune's conclusory opinion.

To the extent plaintiff may contend that the objective medical opinion evidence does not support rejection of Dr. Nune's opinion, or suggests that plaintiff's condition did not improve, the Court will not second guess the ALJ's reasonable determination otherwise.  <u>See generally</u> <u>Trevizo</u>, 871 F.3d at 674-75 ("Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld.") (citation omitted).

In sum, the Court has considered plaintiff's arguments and found no basis to remand these proceedings.

///

///

///

///

19

**V.    CONCLUSION**

For the foregoing reasons, the decision of the Commissioner of Social Security is AFFIRMED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:  October 19, 2020

_____/s/_____
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE